341 So.2d 847 (1976)
STATE of Louisiana
v.
Maurice Lee BENNETT.
No. 58230.
Supreme Court of Louisiana.
December 13, 1976.
Rehearing Denied January 21, 1977.
*850 Vincent Wilkins, Jr., Director and Appellate Counsel, Office of Public Defender, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
Maurice Lee Bennett and Donald Ray Sheppard were indicted on a charge of first degree murder for the rape and death of an Louisiana State University co-ed. Defendant Bennett's first trial ended in a mistrial. At his second trial Bennett was found guilty as charged by a unanimous jury of twelve and sentenced to death. The defendant assigned thirty-two errors for reversal of his conviction and sentence.
Assignments of Error Nos. 9, 13, 14, 25, 26, 28 and 29 were neither briefed nor argued and are thereby deemed abandoned. State v. Matthews, 292 So.2d 226 (La.1974); State v. Edwards, 261 La. 1014, 261 So.2d 649 (1972).
The facts surrounding the commission of this crime are as follows: On September 13, 1974 the victim was living in the High Point Apartments in Baton Rouge with two roommates. That night she went out to eat and drink with some friends and was dropped off at her apartment building at *851 approximately 2:00 o'clock on the morning of September 14. She had apparently forgotten her keys and knocked on the apartment door of Felix Vergara, another occupant of the building. Vergara answered the door and noticed that the victim was dazed (possibly intoxicated) and did not communicate well. There was an exchange of conversation, and, as she began walking away, she fell down. At this moment a man came walking past her at a rapid pace. The victim got up, said she was O.K. and Mr. Vergara returned to his apartment. Approximately one minute later Vergara opened his door again, saw the victim knocking on the door of another apartment and also saw the same man who had walked past her previously, approaching her. When the man saw Vergara, he ducked into a nearby laundry room. Vergara returned to his apartment but went outside again and began to look for the victim. He did not find her, but once again saw the same man on the first floor of the apartment building looking upstairs. The person Vergara saw these three times was identified as Donald Ray Sheppard, co-defendant. (The two co-defendants were tried separately; Donald Ray Sheppard's case is not now before this court).
At approximately 3:45 a.m. the victim presented herself at the apartment of a friend who lived a block away from her apartment. She remained there for fifteen minutes and at 4:00 a.m. she knocked on the door of Peter Meisner, who lived in Apartment 8 of the High Point Apartments. She informed him that she had locked herself out of her apartment. Mr. Meisner opened the door and the two of them stood in the open door talking. After talking for a minute or two, Sheppard and the defendant Bennett barged into the open door. One of the two intruders had a .38 revolver and began to beat Meisner over the head with it. Sheppard and Bennett then tied Meisner up. The victim was taken into the back bedroom by one of the two intruders and the other began to move furniture and other items toward the living room window. Some of these items were placed outside through the window. The two intruders eventually switched places and a shot was heard. The intruder who was in the front walked to the back and asked the other if he had killed her. There was no reply. Bennett then took a long kitchen knife and stabbed Meisner three or four times. The intruders then left the apartment through a window. Meisner staggered into the back room and found the victim nude from the waist down with a pillow over her head with a bullet hole through the pillow and her head. Meisner managed to walk to another apartment and the police were called. A vaginal smear was taken of the victim and it was found that she had had sexual relations.
Assignment of Error No. 1
The defendant contends that the trial court erred in denying a motion for a continuance which was based on the ground that the defendant had not been provided with a transcript of his first trial, which had ended in a mistrial. A transcript of those proceedings had never been prepared. (The trial judge held a contradictory hearing on this motion). Defense counsel, who had been appointed approximately forty days prior to the hearing on the motion for a continuance, had never asked for a transcript until he filed the motion for the continuance. In addition, defense counsel had spent several days listening to the tapes of the mistrial. C.Cr.P. 712 provides:
"A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor."
The granting of a motion for a continuance is a matter addressed to the sound discretion of the trial judge and his ruling will not be disturbed absent a clear showing of an abuse of discretion. State v. Weathers, 304 So.2d 662 (La.1974); State v. Navarre, 289 So.2d 101 (La.1974); cf. State v. Jarrow, 331 So.2d 1 (La.1976); State v. Brown, 322 So.2d 211 (La.1975). Under the circumstances of this case, including the time that defense counsel had to prepare and the fact that he did in fact listen to the *852 tapes of the mistrial, no abuse of discretion has been demonstrated.
Assignment of Error No. 2
On October 14, 1975, the day trial was to begin, the defendant moved for a continuance based on the absence of a material witness. The trial judge denied the motion on the ground that defense counsel had failed to have a subpoena issued for the witness. C.Cr.P. 709 provides:
"A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness."
Generally, the "due diligence" requirement of article 709 is not satisfied when defense counsel fails to have the potential witness subpoenaed. State v. Larue, 324 So.2d 384 (La.1975); State v. Elias, 230 La. 498, 89 So.2d 51 (1956) and cases cited therein. In this case, the defendant argues that notwithstanding his failure to subpoena the witness, he had exercised due diligence in an effort to procure his attendance. Defense counsel testified that he had checked five different Baton Rouge addresses on the witness and that only on the night before trial did he discover a current address of the witness in Arnaudville, St. Landry Parish. At this point, however, defense counsel still failed to subpoena the witness.[1] However, for the purpose of argument, even if it could be said that defense counsel did satisfy the due diligence requirement, neither the written motion for the continuance nor defense counsel's oral statement at the hearing on the motion demonstrate "a probability that the witness will be available" if the trial is continued. C.Cr.P. 709(2); cf. State v. Cain, 307 So.2d 621 (La.1975); State v. Jackson, 258 La. 632, 247 So.2d 558 (1971). There was no abuse of discretion by the trial judge in denying the defendant's motion for a continuance.
Assignments of Error Nos. 3 and 20
The defendant contends that the trial court erred in denying defendant's motion for the disclosure of the identity of the policeman who interviewed Mr. Meisner immediately after the incident while Mr. Meisner was being transported to the hospital. As the State points out in its brief, the defense motion was not for the policeman's identity but was a request for the discovery of the statements made by Mr. Meisner to the policeman. However, in arguing the motion, the defense counsel also requested the name of the police officer to whom the alleged statements were made. Defense counsel now argues that the identity of the police officer should have been revealed because it was evidence favorable to the accused and was material to the defendant's guilt or innocence under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This argument is based on the defendant's assertion that the statements made by Meisner would show that the identification he made of the defendant was weak.
*853 In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court noted that a constitutional violation of the prosecutorial duty to disclose is not demonstrated unless the omission is of sufficient significance to amount to a denial of defendant's right to a fair trial. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." 427 U.S. 97, 109, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353. Rather:
" . . . The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial...." 96 S.Ct. 2392, 2401-02.
In this case the officer's identity would be significant only to the extent that he could testify to statements made by Meisner which would reflect upon the correctness of his identification of the defendant. The State points out Meisner had already testified three times as to his identification of the defendant (once at the trial of defendant's alleged accomplice, once at the preliminary hearing and once at the mistrial of defendant) and that the State had nothing else in its files which could add to Meisner's testimony. Furthermore, Meisner testified that his statements given to this police officer were substantially the same as his testimony at trial and his testimony given on the three previous occasions. Mr. Meisner was extensively cross-examined at the trial and defense counsel brought out evidence that Meisner's identification of defendant was initially weak.
Thus, since defense counsel contends that the statements given to the police officer would only show that Meisner's identification was weak, an aspect already brought out, it cannot fairly be said that the omitted evidence "creates a reasonable doubt that did not otherwise exist." These assignments are without merit.
Assignment of Error No. 4
The defendant contends that he was twice put in jeopardy for the same offense because the mistrial in his first trial was illegally ordered. The defendant raised this error through a motion to quash. C.Cr.P. 591 provides:
"No person shall be twice put in jeopardy of life or liberty for the same offense, except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with the express consent of the defendant."
During the State's closing argument in the first trial, one of the jurors, Mrs. Elizabeth Krake, became visibly upset emotionally, whereupon the trial judge ordered a recess. The judge had the juror examined by Dr. F. A. Silva who then testified that she was unable to continue as a juror. The trial judge then declared a mistrial. (Apparently only twelve jurors had been chosen and there was no alternate available). C.Cr.P. 775 provides:
"A mistrial may be ordered, and in a jury case the jury dismissed, when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;
(5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial.

*854 Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial." (Emphasis added).
The inability of the juror to continue was a permissible ground for a mistrial pursuant to C.Cr.P. 775(5); State v. Roberson, 225 La. 74, 72 So.2d 265 (1954). Therefore, there was no error by the trial judge in denying the defendant's motion to quash based on this ground. This assignment lacks merit.
Assignment of Error No. 5
The defendant contends that he was denied the equal protection of the law guaranteed by the Fourteenth Amendment of the United States Constitution and Art. 1, § 3, Louisiana Constitution of 1974, in that during voir dire, the State peremptorily challenged every prospective black juror who was not otherwise excused by the trial judge.
The United States Supreme Court, in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), has held that an accused is not denied the equal protection of the law when the State, through the use of its peremptory challenges, prevents blacks from serving on his jury unless he can prove systematic exclusion over a period of time. This court has adopted those views expressed in Swain and has refused to find a denial of equal protection unless this historical pattern of systematic exclusion is demonstrated. E.g., State v. Haynes, 339 So.2d 328 (La.1976); State v. Gray, 285 So.2d 199 (La.1973). The defendant has made no such showing in this case. Therefore, no equal protection violation has been demonstrated.[2] This assignment lacks merit.
Assignment of Error No. 6
During the State's opening statement the prosecutor, in describing the sequence of events leading up to the crime, said that the defendant and an accomplice forced their way into the apartment and then (pointing at the defendant) the prosecutor said: "One of them had a .38 caliber revolver and commenced to beat Peter Meisner over the head with it . . ." Defense counsel immediately moved for a mistrial on the ground that the action of the prosecutor, in pointing at the defendant, implied that it was the defendant who did the whipping, and since the State could not in fact prove which intruder had hit Mr. Meisner, the defendant was unfairly prejudiced in the eyes of the jury.
Initially, it must be pointed out that the prosecutor used the language "one of them. . ." and did not say that it was this defendant who hit Mr. Meisner. The scope of the State's opening statement is delineated in C.Cr.P. 766 which provides:
"The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge."
The prosecutor, in mentioning the pistolwhipping, was merely describing the sequence *855 of events that led up to the crime for which the defendant was on trial. From the time that the defendant and his accomplice entered Mr. Meisner's apartment until the time they fled, they were involved in one continuous transaction. See State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970); State v. Schoonover, 252 La. 311, 211 So.2d 273 (1968). There was nothing improper in the prosecutor describing this incident. This assignment lacks merit.
Assignments of Error Nos. 7 and 8
The defendant contends that the trial court erred in allowing an unknown person to be brought into court to be identified by two of the State's witnesses. The "unknown" person who was brought into the courtroom for identification was Donald Ray Sheppard, the defendant's alleged accomplice. Sheppard was brought in so that Felix Vergara, a State witness, could identify him as the man he saw near the scene of the crime. Sheppard was also brought in while Peter Meisner was on the stand. In fact, however, Meisner was unable to identify Sheppard as one of the perpetrators. As defense counsel apparently admits, this lack of identification rather than helping the State's case, could only have the opposite effect, that is to impeach that witness' identification testimony. However, defendant asserts that his ability to cross-examine the witness was impaired because the identity of the person brought into the courtroom was not revealed. Notwithstanding this argument, prejudice to the defendant by this attempted identification is not apparent. This procedure for identification by witnesses has recently been approved by a majority of this court in State v. Kaufman, 331 So.2d 16, 22 (La.1976). These assignments lack merit.
Assignment of Error No. 10
In the process of cross-examining a State witness, Anthony Reed, defense counsel attempted to inquire into the details of the witness' past conviction for burglary. The State objected to any inquiry into the details of this conviction and the trial judge sustained the objection.
Both the State and the defendant agree that it was error for the trial judge to sustain the objection. In State v. Jackson, 307 So.2d 604 (La.1975), this court held that it was proper to inquire into the details of past convictions of a witness (for the purpose of impeaching his credibility) so that the true nature of the offense can be established. See also State v. Elam, 312 So.2d 318 (La.1975). Therefore, Mr. Reed should have been permitted to testify concerning the conduct involved in the prior conviction. However, in the factual context before us, the failure of the trial judge to permit this line of questioning does not constitute reversible error.
Since we are unaware of the precise nature of the prior burglary (a matter of record presumably available to counsel), we are unable to say whether eliciting the details of that crime would have helped to impeach the credibility of the witness. In addition, it was brought out during this witness' testimony that he had been indicted for perjury regarding his testimony in this case. It is doubtful that the effect of Reed's prejudicial testimony would have been diminished to any substantial degree by laying before the jury details of the burglary he had previously committed. Therefore, although error was committed, it was not of such magnitude to warrant reversal.
Assignment of Error No. 11
Defense counsel objected to the introduction into evidence of a picuture of a watch stolen during the commission of the crime. The picture was properly identified as representing the watch taken from Meisner at the scene of the crime. Defendant based his objection on R.S. 15:436, alleging that the watch was in the possession of the State and should be produced as the "best evidence." This was defendant's sole objection to this evidence. Even assuming that the best evidence rule should and does apply to real evidence, this assignment does not present reversible error. Defendant has simply not shown how the defense was *856 impaired by the introduction of the picture of the watch as opposed to the watch itself. Absent a showing of some prejudice to the defendant, the "best evidence" rule will not be applied unreasonably. See State v. Fallon, 290 So.2d 273, 290 (La.1974).
Assignment of Error No. 12
Sometime after the commission of the crime, Mr. Meisner attended two lineups. In the first line-up he picked out two men neither of whom was the defendant. Apparently part of Mr. Meisner's error in this line-up was due to his misconception that he was to pick out the two men who most closely resembled the defendant and his alleged accomplice. In this first line-up the defendant was in fact not present. At the second line-up the defendant was identified. State exhibits numbers 6 and 8 represented the results of the first and second line-ups respectively. However, exhibit number 8 was improperly marked "Line-up Number 1." Defendant's objection to the introduction of exhibit number 8 forms the basis for this assignment of error. He contends that he was prejudiced because it misled the jury about the true chronology of the line-ups.
The State contends that this improper marking was a "simple mistake." However, from the testimony it appears that the district attorney knew or should have known that the label was erroneous. Thus, when defense counsel objected the prosecutor should have simply supplied the correct markings. His failure to do this was improper, but the error does not warrant reversal.
Defense counsel at least three times during cross-examination of Mr. Meisner brought out the fact that Mr. Meisner was mistaken in the first line-up and had correctly identified defendant in the second line-up. Thus, it does not appear that the jury was misled. However, even assuming that the jury may have been somewhat confused as to the actual chronology of the line-ups, this did not prejudice the accused. Defense counsel adequately established that at one of the two line-ups the State witness had picked out the wrong men. For this reason, this assignment does not present reversible error.
Assignments of Error Nos. 15, 16, 17, 18 and 19
During voir dire, both the trial judge and the State discussed the law of conspiracy and the State again referred to the law of conspiracy in its opening statement. Defense counsel objected on the ground that the defendant was not being tried for the inchoate offense of conspiracy. These objections form the basis of Assignments Nos. 15, 16 and 17. Defense counsel also objected when the State sought to elicit testimony relative to the fingerprint identification of Donald Ray Sheppard (the defendant's alleged accomplice) and when the State sought to introduce an exhibit which dealt with Sheppard's fingerprint identification. These objections form the basis of Assignments Nos. 18 and 19.
R.S. 14:26 defines the offense of conspiracy as follows:
"Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.. . ."
When the facts of the case establish the existence of a conspiracy, the State is permitted to take advantage of the evidentiary rule found in R.S. 15:455 which provides:
"Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his codefendant. But to *857 have this effect a prima facie case of conspiracy must have been established."
Therefore, if the State did in fact establish a prima facie case of conspiracy, the various references to the law of conspiracy and the introduction of acts of the co-conspirator (Sheppard) were proper. State v. Carter, 326 So.2d 848 (La.1975).
In State v. Carter, supra, this court had to decide whether a prima facie case of conspiracy had been established. In reversing defendant Carter's conviction on the ground that reference to the law of conspiracy and the acts and declarations of the alleged co-conspirator were improper because no prima facie case of conspiracy had been established, this court said the following:
"We hold that when the only showing of a conspiracy is that two people committed a crime, and there is no showing that defendant either committed or conspired to commit the criminal act, no prima facie case of conspiracy has been established. We further hold that the fact, alone, that two or more have committed the crime charged is not sufficient to establish a prima facie case of conspiracy." (Emphasis added). 326 So.2d 848, 854.
The facts in Carter are far different from the ones presented here. In Carter an armed robbery had been perpetrated at a grocery store by two men. The defendant was not identified as one of those who committed the robbery. He was identified as being in an automobile at about the time of the robbery, several miles from the scene, which was occupied by one person later identified as a robber and by another person subsequently arrested in the car, which had a gun in the glove compartment. The defendant was not even in the alleged "getaway car" at the time of his arrest. Under the circumstances of that case, this court held that a prima facie case of conspiracy had not been established.
In the case before us now there was abundant evidence that the defendant in fact committed the crime. Bennett was identified by Peter Meisner, one of the victims, as one of the two intruders who entered his apartment and committed the crime. Anthony Reed testified that the defendant came to his house on the morning of the crime and told him that he had shot a white girl. In addition, James O'Connor testified that one day after the murder the defendant told him that he (Bennett) and Sheppard had gone to High Point, killed a girl and burglarized the premises.
In addition, there was evidence that the defendant and Donald Ray Sheppard conspired to commit the crime. Felix Vergara testified that on three separate occasions on the night of the crime, within two hours of its commission, he saw Donald Ray Sheppard approaching the victim in the hallway of the apartment building and later looking up the stairs. Then, when Peter Meisner and the victim were talking in the hallway sometime later, two individuals barged into the apartment and committed the crime. A logical inference to be drawn from the observations of Mr. Vergara and Mr. Meisner is that Bennett's accomplice was a "lookout," trying to find an appropriate time and place to commit the crime. (This inference is bolstered by the fact that on the second occasion as Sheppard was viewed by Vergara in the hall, when Sheppard noticed Vergara's presence, he ducked into a laundry room). In addition, the testimony of James O'Connor is evidence that there existed an "agreement or combination of two or more persons for the specific purpose of committing . . . [a] crime." R.S. 14:26. The testimony of Mr. O'Connor was as follows:
"Q. All right, and what did this defendant tell you on this occasion?
A. That he and Shep had went down to High Point and killed this chick and burglarized the place and they had to get out of town, they had really messed up."
This testimony demonstrates that the defendant and his accomplice were working in combination in the perpetration of this crime.
Considering all the evidence it can fairly be said that the State did establish at least *858 a prima facie case of conspiracy, and therefore there was no error in referring to the law of conspiracy or in using evidence of his co-conspirator's acts against the defendant. R.S. 14:26, 15:455. These assignments lack merit.
Assignments of Error Nos. 21 and 22
Assignment of Error No. 21 relates to the court's overruling defendant's motion to quash the indictment on the grounds that it was allegedly illegally procured because the district attorney had a personal interest in the case, and because he and certain members of his staff were to be material witnesses at trial. Assignment of Error No. 22 relates to the overruling of defendant's motion to have the district attorney recused from the case on the same grounds. The alleged interest in the case which is in conflict with a fair and impartial administration of justice allegedly results from the district attorney offering a reward for information in the case and the fact that when the defendant was arrested he was taken directly to the district attorney to be interviewed. As the State correctly points out, the defendant has not shown by these facts that the district attorney acted in any way other than in a manner consistent with his function as the prosecutorial force in the parish. This part of the assignment lacks merit.
Defendant relies upon State v. Donahue, 315 So.2d 329 (La.1975), in which the court granted a remedial writ and ordered the district attorney recused because he was the sole witness to the content of an oral confession and it was acknowledged that he would be a witness in the case. However, in the case at bar, the district attorney and one of his assistants were called by the defense and testified on rather minor points. Assistant district attorney Graphia merely testified that a gun used in the commission of the crime was in his possession. The district attorney testified that he had offered a reward for information in the case and he also read approximately four lines out of a newspaper. These facts do not show that the district attorney should be recused. These assignments lack merit.
Assignments of Error Nos. 23, 24 and 32
Assignment of Error No. 32 relates to the trial judge's overruling of a motion to recuse the judge and Assignments of Error Nos. 23 and 24 relate to the judge's overruling of defendant's motion to "transfer." The motion to recuse the judge alleged that recusal was necessary because (1) the judge has a personal interest and "said interest is the result of his prejudice; to such an extent that he would be unable to conduct a fair and impartial trial;" (2) "because he performed a Judicial act in another case where co-defendant was convicted of the same charge in question;" and (3) "because for other reasons, he would be unable to conduct a fair and impartial trial because he previously shown (sic) prejudice in the same case where a mistrial has been granted." (The defendant drafted and filed this motion in proper person). The "motion to transfer" alleged as grounds therefor (1) the judge's issuing of search warrants as to defendant; (2) the judge's denial of the co-defendant's application for a writ of habeas corpus; (3) the judge's sitting in the co-defendant's trial; and (4) the fact that the trial judge presided over defendant's first trial which resulted in a mistrial. Although the Code of Criminal Procedure does not provide for a procedural vehicle such as a "motion to transfer," we will treat the motion as a motion to recuse the judge.
The defendant argues in brief that these motions were improperly ruled on by the judge to whose recusal the motions were directed. C.Cr.P. 674 provides that "if a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion for hearing to another judge or to a judge ad hoc . . ." (Emphasis added). Therefore, the judge to whom the motion relates must answer the threshold question of whether the motion states valid grounds and need not refer the motion to another judge if the motion *859 presents mere conclusions of the defendant. State v. Collins, 288 So.2d 602 (La.1974).
The first and third grounds in the motion to recuse are mere conclusions and are not substantiated by any facts. As such the judge did not err in denying the motion on these grounds. State v. Maduell, 326 So.2d 820 (La.1976); State v. Laborde, 214 La. 644, 38 So.2d 371 (1948). The remaining contentions are based on C.Cr.P. 671(5) which provides: "Has performed a judicial act in the case in another court." (Emphasis added). Insofar as the allegations are based on the judge's participation in the co-defendant's trial, this does not constitute a valid ground because this was another case and in any event the actions were not made in another court. Insofar as the allegations are based on the judge's participation in defendant's mistrial or pretrial of the instant case, all of these were done in the same court. Thus, these grounds do not show that the judge performed any judicial acts in the same case in an inferior or superior court and the motions were properly denied.
These assignments lack merit.
Assignments of Error Nos. 30 and 31
In these assignments the defendant contends that the trial judge erred in refusing to grant his motion for a change of venue. A hearing on the motion for a change of venue was held in accordance with State v. Bell, 315 So.2d 307 (La.1975). At that time the defendant was permitted to introduce evidence concerning publicity given the case, prejudice in the public mind, and other evidence tending to show why an impartial trial could not be obtained in East Baton Rouge Parish. At the conclusion of the three day hearing on this motion the trial judge denied the motion for a change of venue. C.Cr.P. 622 provides:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
As this court pointed out in State v. Bell, supra, although jurors might be selected who individually would not be subject to challenge for cause, other factors might still necessitate a change of venue:
". . . The defendants were entitled to a change of venue if they could show, even though it would be possible to select a jury whose members were not subject to a challenge for cause, that there were influences in the community which would affect the answers of jurors on the voir dire, or the testimony of witnesses at the trial, or that, for any other reason, a fair and impartial trial could not be obtained in the parish. . . ." 315 So.2d 307, 313.
See also C.Cr.P. 622, Official Revision Comment (b).
Essentially, the trial judge must determine whether or not a fair and impartial trial can be obtained in the parish. If such a trial is unavailable, for whatever reason, a change of venue should be granted. In analyzing the change of venue question, the following factors should be considered:
". . . (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of *860 the prospective jurors on voir dire." 315 So.2d 307, 311.
Considering these factors individually, the following evidence was adduced:
Nature and Degree of Pretrial Publicity
The defense offered the testimony of several newspaper reporters, nineteen newspaper stories on the crime, and the transcripts of several television accounts of the crime. While there was extensive coverage of this incident, there was no showing that the media reports were other than "objective coverage." State v. Stewart, 325 So.2d 819 (La.1976). In addition, one newspaper reporter testified that this murder generated no more publicity than any other. See State v. Foy, 278 So.2d 38 (La.1973).
Connection of Government Officials With Release of Publicity
The district attorney did hold a news conference after the arrests were made in this case. However, it appears that such announcements are often made after arrests in criminal cases. In addition, there was no showing that any of the information released by the district attorney was other than factual.
Length of Interval Between Publicity and Trial
Most of the publicity occurred immediately after the crime had been committed (September, 1974) and the hearing on the first motion for a change of venue was held almost eight months later. While it would be impossible to specifically delineate how much time must pass to assure sufficient protection from publicity (see State v. Butler, 322 So.2d 189 (La. 1975); State v. Poland, 255 La. 746, 232 So.2d 499 (1970)), there was no showing that the delay here was insufficient. A motion for speedy trial was filed by defendant on May 11, 1975. On May 23, 1975, a mistrial was ordered. Another motion for change of venue was filed September 9, 1975, tried and denied October 7, 1975. This trial commenced October 14, 1975.
Other Events Occurring in the Community Which Affect or Reflect the Attitude of the Community or Individual Jurors Toward the Defendant
An ordinance was passed by the City Council shortly after the murder which authorized the building of a ten foot fence around the High Point Apartments. However, Councilman Watts testified that the ordinance was not passed as a result of this murder, but rather the major impetus for its passage was vandalism of the apartment property.
A Rape Crisis Intervention Center was initiated in Baton Rouge, but the center was not operational at the time of the trial. In addition, the defendant cites the distribution of a certain bumper sticker which had the first name of the victim followed by the phrase, "Pick a Flower for Me." The sticker included no reference to the defendant and testimony revealed that the stickers were circulated only on the L.S.U. campus and that the distributors experienced difficulty in disposing of them.
In a motion for a change of venue the defendant has the burden of showing that he cannot obtain a fair trial in the jurisdiction in which he is being prosecuted. State v. Stewart, supra; State v. Dillard, 320 So.2d 116 (La.1975); State v. Bell, supra. The granting or denial of the motion is within the sound discretion of the trial judge and will not be disturbed unless it is demonstrated that the evidence adduced affirmatively shows that the ruling was erroneous and an abuse of discretion. State v. Stewart, supra; State v. Dillard, supra; State v. Richmond, 284 So.2d 317 (La.1973). The defendant has failed to carry his burden in this case. There was no abuse of discretion by the trial judge in denying the motion for a change of venue.
Assignment of Error No. 27
In this final assignment the defendant contends that the trial court erred in failing to sustain his motion to quash the indictment on the ground that the death penalty for the crime of first degree murder constituted cruel and unusual punishment.
*861 The death penalty imposed on the defendant in this case may not be carried out due to the decision of the United States Supreme Court in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). However, since there is no other reversible error, the conviction of the defendant is affirmed. State v. Smith, 339 So.2d 829 (La.1976); State v. Jenkins, 340 So.2d 157 (La.1976). Pursuant to these cases the procedure to use in sentencing is to impose the most severe penalty established by the legislature for criminal homicide at the time of the offense.
Accordingly, the defendant's conviction is affirmed, but the death sentence imposed is annulled and set aside, and the case is remanded to the district court with instructions to the trial judge to sentence the defendant to imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years. See R.S. 14:30.1, as added by Acts 1973, No. 111, § 1.
NOTES
[1] Even on the morning of trial, the proper procedure would have been for the defendant to subpoena the witness pursuant to C.Cr.P. 740 which provides:

"A defendant who wishes to have a subpoena issued for the attendance of a witness who is not residing in the parish where the trial or hearing is held shall file a written application with a supporting affidavit stating the address and parish wherein the witness resides. The application shall state that the testimony of the witness is relevant, material, and not cumulative. The court shall make a private inquiry into the facts of the case to determine whether the witness is indispensable to the trial or hearing. If satisfied, the court may order the subpoena issued. If the court finds that the subpoena should not issue, it shall state its reasons in writing, which shall become a part of the record. Payment of the expenses of obtaining witnesses under the provisions of this article shall be governed by Article 738 and Article 739."
See State v. Larue, supra.
[2] However, note the concurring opinion of Justice Dennis in State v. Haynes, supra. In discussing the frequency of this identical claim in cases tried in East Baton Rouge Parish, Justice Dennis said the following:

"Because these cases represent only a small number of those tried in East Baton Rouge Parish, I cannot say that this record alone indicates an historical system of discriminatory exclusion. However, these cases may trace the outlines of a pattern of exclusion, and if it can be demonstrated in a future case that the practice complained of has not been restricted to isolated instances, then the State should be required to establish that the exclusion of blacks is rooted in some other cause than racial discrimination. For, to exercise peremptory challenges solely on the basis of race without regard to legitimate trial-related objectives is to pervert the purpose of and abuse the broad discretion inherent in that procedure. See, Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)." 339 So.2d 328, 335.